REGAN, Judge.
The plaintiff, Woodrow H. Bean, a welder’s helper, instituted this suit against the defendants, Higgins, Inc., his employer, and Columbia Casualty Company, its liability insurer, endeavoring to recover compensation at the rate of $30 per week for a period of 400 weeks less compensation previously paid, plus attorneys’ fees and penalties, for permanent total disability as the result of an injury incurred by him on September 18, 1953, when his right hand was caught between the fan blades of a welding machine, resulting in the partial amputation of the middle o'r second finger and the laceration of the third or ring finger.
The defendants answered admitting the occurience of the accident, but averred that plaintiff had already been paid more compensation than he was entitled to since he has fully recovered and, in the alternative, asserted that if the court should find that plaintiff is presently disabled, his disability is limited to 7% loss of the use of his right hand, and he should recover only “7% of 65% of his weekly wage for 150 weeks.”
The trial judge was of the opinion that the plaintiff had suffered a permanent partial disability and, therefore, was entitled to 65% of the difference between the wage he was earning at the time of the accident, $55.27 per week, and the average wage he had earned since the accident, $25 per week, and, accordingly, rendered judgment in his favor in the sum of $19.67% per week for a period not exceeding 300 weeks subject to a credit for I0/r weeks’ compensation previously paid and subject to a further credit of $3 per week paid plaintiff from December 1, 1953 to date. From this judgment both plaintiff and defendants have prosecuted this appeal.
The record reveals that on September 18, 1953, at about 3:55 p. m., the plaintiff, acting upon instructions from his foreman, mounted a ladder to turn off the welding machines ; as he reached to press the switch to stop the first machine, his hand was caught in the blades of a fan amputating part of his middle finger and lacerating his ring finger; he was removed from the situs of the accident by ambulance to the first aid station and thereafter to the office of Dr. John D. Andrews, his employer’s physician; he was given a local anesthetic, the laceration cleaned and the necessary pieces of bone removed in order to close the amputation; he was treated by Dr. Andrews until November 20, 1953, when he was discharged as able to return to work. Plaintiff related that he did not return to his employment due to the painful condition of his hand.
On November 30, 1953, at the defendants’ request plaintiff was examined by Dr. Daniel C. Riordan, an orthopedic surgeon, who was of the opinion:
“This man has had a traumatic amputation of the right long finger with several small lacerations of the ring finger. The lacerations have healed. The *247 traumatic amputation has had a satisfactory closure. There is still a little bit of swelling and tenderness at the tip of the finger and this has produced a little limitation of motion of the proximal interphalangeal joint of this amputated long finger. We feel that the patient has made a full recovery, as far as medical aspects are concerned and that he is able to return to work now. He will experience some pain and discomfort in this long finger until he regains full motion of the finger. At the present time it is felt that he has a permanent partial disability of the right hand, estimated at 7%. This is due to the amputation of the finger in the middle of the middle phalanx.”
In the early part of December, 1953, plaintiff obtained employment with the Arrow Dump Truck Company washing and shining cars, but had to leave there after two weeks because “I couldn’t do the work because I kept bumping my hands and my hand stayed swollen and paining me and they tried to help me out some but I couldn’t do any work. * * Plaintiff then visited the Charity Hospital as an “out patient”, where his hand was examined; he was given medication to relieve the pain and advised to soak it in hot water; on January 12, 1954, he was informed by a member of the staff thereof that he should undergo “general surgery for excision of painful neuromata.” He did not return to the Hospital because he “was afraid to because I had * * * trouble with it before when it was cut off. I didn’t want to go through any more operations.” Plaintiff then secured employment during the months of January and February, 1954, with A. M. & J. Solari, doing porter work and driving a truck, at a salary of $25 per week. He testified that he was informed by the man in charge that “he had to get rid of me because I couldn’t do the work, he had to have someone there to do his work for him. * * We had a lot of boxes of canned goods and stuff to pick up and I didn’t have enough strength to handle the cases.” On the other hand, A. J. Franz, Secretary-Treasurer of Solari’s related that the manager thereof was forced to discharge plaintiff because his work was unsatisfactory; the manager had to continually “egg him on to get the work out of him.”
On March 18, 1953, plaintiff was again examined by Dr. Riordan, who was of the same opinion as he had been in November, 1953, except the plaintiff “had a little less motion at the proximal or middle joint of that (the amputated) finger as compared to what he had before and we felt that was due to disuse because the patient seemed to hold his finger stiff when he attempted to use the hand for any activity.”
On April 6, 1954, plaintiff, at the request of the defendants, consulted Dr. Irvin Ca-ben, an orthopedic specialist. Dr. Cahen had x-rays made of plaintiff’s hand and, in due course, addressed a letter to defendants’ attorney, expressing the opinion that:
“The clinical history in this case has indicated that the patient sustained direct trauma to the third digit, which necessitated amputation at the basal region of the mid phalanx. According to the patient there was also an involvement of the tip of the fourth digit, but insofar as evidence of laceration is presently concerned these conditions have apparently healed. In addition to the amputation of the digit, this patient now has residual disability involving a lack of extension of the proximal inter-phalangeal joint of the third and fourth digits to a degree of range, as indicated above, and likewise has had restriction in flexion of the proximal interphalan-geal joint of the third digit.
“Since this condition has occurred over a prolonged interval and since there appears to be some fibrosis within the area, it is believed that the restrictions of the third digit are apparently permanent, and that with continued usage, the examiner would expect some improvement in extension of the fourth digit.
“Upon the basis of the present involvement, it is believed that this individual has disability to the hand of five *248 percent. This rating is given on the loss of the portion of the .third digit plus the restrictions of motion noted above. It is the opinion of the examiner that this degree of involvement is insufficient to prevent his return to his former occupation, and believe that this individual should be able to use the hand to a satisfactory degree for his previous work, upon the basis of his employment as a laborer. From the orthopedic standpoint, the examiner would not indicate any additional procedure with the exception of continued usage of the hand, since it is believed that the lack of extension of the fourth digit will clear.”
On April 13, 1954, at the request of plaintiff’s attorney he consulted Dr. Blaise Salatich, an orthopedic surgeon. After having x-rays of plaintiff’s right hand made, Dr. Salatich expressed the opinion that:
“This orthopedic examination involves well developed and nourished 32 year colored male answering apparently intelligently and sincerely describing an injury of his right hand sustained on September 18, 1953, following a significant degree of crushing type force exerted on the third and fourth digits of this hand resulting in complete amputation of the distal half of the third finger. The present complaint including positive objective clinical findings demonstrated on examination at this time, are considered to be well founded and consistent with such an entity coming well within the limits of expectancy in this case.
“The electric shock painful sensation described initiated by pressure exerted over tire amputation stump is probably due to the presence of á post-traumatic neuromata with the sequelae of such an injury resulting in a significant degree of residual disability. The overall dis-function of the entire right hand is considered to be increased out of proportion to the specific pathology demonstrated. This condition is considered to be of a permanent nature.
“The positive subjective and objective clinical findings are considered sufficiently significant to warrant inability to carry on any undue imposing strenuous and laborous physical activities, especially such activities requiring any undue amount of sustained effort, stamina and exertion. This patient cooperated fully during this entire examination.”
Plaintiff insists that the trial court erred in only awarding permanent partial disability instead of permanent total disability on the theory that plaintiff was a skilled workman as distinguished from a laborer and unable to resume his former occupation.
Defendants, on the other hand, contend that the trial court simply erred in awarding plaintiff any compensation; that the medical evidence preponderantly reflected that he had fully recovered and was able to resume his employment; in the alternative, defendants maintain that if the plaintiff has not fully recovered, his disability, as revealed by the weight of the medical evidence, is limited to 7% and, accordingly, the award of compensation should have been predicated upon this percentage for the loss of the use of the hand for a period not to exceed one hundred and fifty weeks. In conformity with this alternative plea the defendants have and are presently paying plaintiff compensation at the rate of $3 per week.
We observe at the inception of our opinion that the whole context of the record leads us to the inevitable conclusion that plaintiff, was not a skilled workman but a laborer. In substantiation thereof, the plaintiff related that “I was a welder’s helper, assist the welders, helping the welders move things around in the ship where they had to do their welding, picking -up steel plates for them and putting them on racks to weld, helped getting things for them.” The evidence likewise convinces us that if the plaintiff had so desired he could have satisfactorily discharged the duties assumed *249 by virtue of his employment by A. M. & J. Solari.
The only question, therefore, which has been posed for our consideration is whether plaintiff incurred permanent total or permanent partial disability as a result of the accident ?
The answer to the question of whether or not an employee is permanently totally or permanently partially disabled must logically be predicated on the medical evidence adduced during the course of the trial unless, of course, the experts are in substantial disagreement. The court below concluded that the expert medical evidence preponderated in favor of the plaintiff to-the extent that he had incurred a 7% permanent partial disability of the right hand. A careful examination of the record reflects that the defendants’ own medical experts expressed the opinion that as a result of the accident plaintiff incurred a permanent disability of approximately 7% to his right hand, but despite this disability he was able to resume his former employment. In opposition thereto plaintiff’s medical expert insists that his disability is both permanent and total, and that he is unable to resume his former occupation. This conclusion was predicated on the existence of a painful neuromata, or in the vernacular of the layman “a mushrooming of the nerves of the finger in the area of the amputation.” However, none of the other experts expressed the opinion that plaintiff was afflicted with “a painful neuromata”, but all of the experts agreed that if such a condition existed simple surgical excision would eliminate it.
We are impressed by the testimony of Drs. Andrews, Riordan and Cahen which fixed the percentage of disability incurred by the plaintiff. The trial judge was likewise impressed, and we are in full accord with his conclusion that the plaintiff incurred a permanent partial disability and is entitled to 65% of the difference between the wages he was earning at the time of the accident and the wages he has been able to earn thereafter, for a period not exceeding three hundred weeks, in conformity with the provisions of LSA-R.S. 23:1221(3), subject to a credit of the compensation already paid. Obviously this is not one of those cases which falls within that category where an employee suffered a 7% disability which had the effect of reducing his earning capacity 100%.
For the reasons assigned the judgment appealed from is affirmed.
Affirmed.